UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

KOSHER PROVISIONS, INC.,

                Plaintiff,

-against-

BLUE & WHITE FOOD PRODUCTS CORP.
and BLUE & WHITE FOOD PRODUCTS L.L.C.,

                Defendants.
----------------------------------------------------------------X

MEMORANDUM & ORDER
CV-04-361 (NGG) (SAC)

GARAUFIS, District Judge.

Defendants Blue & White Food Products Corp. ("Blue and White Corp.") and Blue & White Food Products L.L.C. ("Blue and White LLC"), bring this motion to dismiss plaintiff Kosher Provisions, Inc.'s ("KP") amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a cause of action.

For the reasons set forth below, the defendants' motion to dismiss is GRANTED.

## I. BACKGROUND

### A. Factual History

Plaintiff KP is a California corporation with its principal place of business in Vernon, California. (Amended Complaint ("AC") at 2.) KP is a wholesale distributor of Kosher products which does business in the Western United States. (Id.) Defendant Blue and White Corp. is a New York corporation with its principal place of business in Astoria, New York. (Id.) Defendant Blue and White LLC is a New York limited liability company which likewise has its

principal place in Astoria, New York. (Id.) The two are hereinafter collectively referred to as "Blue & White."

In 2001, KP entered into an oral agreement[1] with Blue & White to become the exclusive West Coast distributor[2] of Kosher products manufactured by Blue & White. (Id.) KP spent a significant amount of money developing and distributing Blue & White's product line. (Decl. of Dafna Millstein at 4.) Blue & White's products constituted seventy-five percent of KP's sales. (Transcript of February 12, 2004 Hearing ("Tr.") at 16.)

In June 2002, KP's president and 50% shareholder Zohar Norman ("Norman") sold his 50% interest in Blue & White to the other shareholder, Yehuda Pearl. (Id.) KP maintains that pursuant to § 4(b) of a June 11, 2002 security agreement (the "Agreement"), Blue & White was required to retain KP as its exclusive distributor in California. (AC at 2, 3.) The Agreement states in pertinent part at § 4(b):

> [Blue & White] will use commercially reasonable efforts to promptly conclude a distribution agreement with [KP] for the distribution of its products within those portions of California in which [KP] now distributes [Blue & White's] products, on terms mutually acceptable to [Blue & White] and [KP]. (AC at 3.)

KP and Blue & White began negotiating the terms of the written distributorship agreement in June 2003. (Id.) KP alleges that Blue & White made commercially unreasonable demands such as limiting the territory of KP's distribution to California, demanding permission

---

[1] KP does not seek relief under the alleged oral agreement with Blue & White. Blue & White asserts that even assuming that KP had sought such relief, the oral agreement would be invalid under the Statute of Frauds. (Def. Br. at 7.) KP does not contest Blue & White's assertion.

[2] KP claims to have been Blue & White's exclusive distributor of Kosher products in California, Arizona, and Las Vegas, Nevada. (AC at 1.)

to use other distributors in California, and preventing KP from selling to any "Club" customers.[3] (AC at 3.)

KP's president, Dafna Millstein ("Millstein"), faxed a letter to Blue & White's CEO, Aryeh Silbert ("Silbert"), on July 14, 2003, advising him that a loss of KP's distribution territories and failure to enter into an exclusive distribution agreement with KP would be unacceptable. (Pl. Ex. F.) KP alleges that on July 16, 2003, Silbert provided written assurances that KP would receive a distributorship agreement from Blue & White.[4] (AC at 3.) In his fax, Silbert stated, "Yes, I agree that we have disagreements on some issues, but I am confident that we can overcome them . . . I suggest that you come to visit us in New York. I am sure we can come to an agreement that we will both be happy with." (Pl. Ex. G.) Silbert noted that he believed that the disagreement between the parties revolved around KP's desire to retain its Las Vegas customers and KP's emotional problem with "D & A."[5] (Id.) On August 5, 2003, Blue & White forwarded a proposed distribution agreement ("Proposed Agreement") to KP. (AC at 4; Pl. Ex. H.) KP maintains that the Proposed Agreement fell short of the terms reflected in the Agreement, and was commercially unreasonable.[6] (AC at 4.)

---

[3] Referring to "clubs" such as Costco, Sam's Club, and BJ's. (Decl. of Dafna Millstein at 8.)

[4] KP argues, however, that "[u]pon information and belief, [Blue & White]'s representation was not true and [Blue & White] did not intend to enter into a distributorship agreement with KP." (AC at 3.)

[5] The parties offer no explanation regarding the reference to "D & A".

[6] Although KP asserts that the terms set out in Blue & White's Proposed Agreement were "commercially unreasonable," KP conspicuously declines to argue, perhaps in light of the two-year long course of negotiations between the parties, that Blue & White breached its obligation under § 4(b) to make "commercially reasonable efforts to promptly conclude a distribution agreement . . . ." I thus understand KP's use of the term "commercially unreasonable" to denote

KP further alleges that on January 6, 2004, without notification to KP, Blue & White ceased shipping products to KP. (Id.) KP's competitor, West Pico Foods, Inc. ("West Pico"), notified KP that it was the new exclusive distributor of Blue & White's products. (Id.) KP maintains that Blue & White had been negotiating with West Pico while negotiating with KP and assuring KP that it would enter into a distributorship agreement with them. (Id.) KP also asserts that the loss of Blue & White's product line would destroy KP. (Decl. of Dafna Millstein at 10.)

**B.     Procedural History**

KP commenced this action on January 29, 2004. KP brings a third-party beneficiary claim alleging breach of contract, promissory estoppel and breach of an implied covenant of good faith and fair dealing.[7]

KP filed a motion for a preliminary injunction and temporary restraining order by order to show cause on January 29, 2004. Magistrate Judge Simon Chrein signed the Order to Show Cause as to the preliminary injunction but denied KP's request for a temporary restraining order. KP and Blue & White presented oral argument on KP's motion for a preliminary injunction before Judge Chrein on February 12, 2004. (Tr. at 1.) Magistrate Chrein issued a recommendation that the motion for a preliminary injunction be denied. (Tr. at 50.) Magistrate Chrein also held in abeyance Blue & White's motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6), in light of KP's intention to amend its initial pleading. (Tr. at 48.)

KP served the amended complaint on March 16, 2004. (Id.) In response, Blue & White renewed its motion to dismiss and requested that the Court substitute the motion for the February

---

proposed contract terms that it did not find to be "mutually acceptable."

[7] Both parties agree that KP is a third party beneficiary of the Agreement. (Tr. at 20.)

9, 2004 dismissal motion. (Def. Br. at 3.) The parties have stipulated that New York law controls this dispute. (Def. Ex. B at 6-7.)

## II. STANDARD OF REVIEW

### A. 12(b)(6) Motion to Dismiss

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a district court must accept all of the plaintiff's factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." Bay Fireworks, Inc. v. Frenkel & Co., Inc., 359 F. Supp. 2d 257, 264 (E.D.N.Y. 2005) (internal citations and quotation marks omitted). "[I]f it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief, the complaint should be dismissed." DynCorp v. GTE Corp., 215 F. Supp. 2d 308, 315 (S.D.N.Y. 2002) (internal citations and quotation marks omitted). In considering a 12(b)(6) motion to dismiss, "a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991).

### B. Breach of Contract

#### 1. Intent to be Bound

Generally, preliminary agreements requiring further negotiation do not create binding obligations. See Shann v. Dunk, 84 F.3d 73, 77 (2d Cir. 1996). Without a mutual intent to be bound, there is no contract. See Four Seasons Hotels Ltd. v. Vinnik, 515 N.Y.S.2d 1, 5 (N.Y. App. Div. 1987). "[A]s a general rule, the construction of a written instrument is a question of law for the court . . . ." Id. at 5-6 (internal citations and quotation marks omitted). "[S]ince the interpretation of a contract generally is a question of law to be determined by the court, the court

may dismiss a complaint based on a contract if the contract unambiguously shows that the plaintiff is not entitled to the requested relief." DynCorp, 215 F. Supp. 2d at 315 (internal citations omitted). To determine whether the parties intended to enter into a contract, courts apply an objective test, looking to the manifestation of a party's intention rather than the party's actual intention as controlling. See Four Seasons, 515 N.Y.S.2d at 6. Thus, above all else, New York courts "look[] to the language of the preliminary agreement for indication whether the parties considered it binding or whether they intended not to be bound until the conclusion of final formalities." Teachers Ins. & Annuity Ass'n of America v. Tribune Co., 670 F. Supp. 491, 499 (S.D.N.Y. 1987).

### 2. Indefiniteness of Material Terms

If the material terms of an agreement are not reasonably certain, there is no enforceable contract. See Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher, 417 N.E.2d 541, 543 (N.Y. 1981). Where a preliminary agreement "expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated," the agreement may be binding. Tribune, 670 F. Supp. at 498; see Shann, 84 F.3d at 77 (adopting analysis in Tribune differentiating between two types of preliminary contracts).[8] However, this type of agreement "does not commit the parties to their ultimate contractual objective but rather

---

[8] Tribune separates preliminary contracts into two categories: "Type I is where all essential terms have been agreed upon in the preliminary contract, no disputed issues are perceived to remain, and a further contract is envisioned primarily to satisfy formalities. Type II is where the parties recognize the existence of open terms, even major ones, but having agreed on certain important terms, agree to bind themselves to negotiate in good faith to work out the terms remaining open. In Type II agreements, the parties do not bind themselves to conclude the deal but only to negotiate in good faith toward conclusion within the agreed framework." Shann, 84 F.3d at 77 (internal citations omitted).

to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework." Tribune, 670 F. Supp. at 498. Good faith differences in the negotiation may prevent the parties from reaching a final contract. Id. at 498.

  **C. Breach of Implied Covenant of Good Faith**

  "Implicit in every contract is a promise of good faith and fair dealing which is breached when a party acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." Skillgames, L.L.C. v. Brody, 767 N.Y.S.2d 418, 423 (N.Y. App. Div. 2003) (internal citations and quotation marks omitted). The purpose of the implied covenant of good faith is to "further an agreement by protecting a promisee against breach of the reasonable expectations and inferences otherwise derived from the agreement. Such protection cannot exist in the absence of an underlying valid contract." Ari and Co., Inc., v. Regent Int'l Corp., 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003) (internal citations and quotation marks omitted). Therefore, "New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and a breach of contract on the same facts . . . ." Bay Fireworks, Inc., 359 F. Supp. 2d at 266 (internal citations omitted); see also B. Lewis Prods., Inc. v. Maya Angelou, Hallmark Cards, Inc., No. 01 Civ. 0530, 2005 WL 1138474, at *11 (S.D.N.Y. May 12, 2005) (holding that because the covenant of good faith is "part and parcel" of the underlying contract, a party does not have a separate cause of action for breach of the covenant of good faith based on the same facts as the breach of contract claim).

  "[W]here the relief sought by the plaintiff in claiming a breach of the implied covenant of good faith is intrinsically tied to the damages allegedly resulting from the breach of contract,

7

there is no separate and distinct wrong that would give rise to an independent claim." Ari and Co., Inc., 273 F. Supp. 2d at 522 (noting that such claims must be dismissed as redundant).

### D. Promissory Estoppel

A party may recover under a promissory estoppel claim only in the absence of an enforceable contract. See Cyberchron Corp. v. Calldata Syst. Dev., Inc., 831 F. Supp. 94, 112 (E.D.N.Y. 1993), *aff'd in part, vacated in part on other grounds* by 47 F.3d 39 (2d Cir. 1995). Under New York law, promissory estoppel has three elements: 1) a clear and unambiguous promise; 2) a reasonable and foreseeable reliance by the party to whom the promise is made; and 3) an injury sustained by the party asserting the estoppel as a result of his reliance. Reprosystem, B.V. v. SCM Corp., 727 F.2d 257, 264 (2d Cir. 1984) (internal citations omitted).

## III. DISCUSSION

### A. KP's Claim That Blue & White Breached the Implied Covenant of Good Faith and Fair Dealing Fails as a Matter of Law

KP asserts that Blue & White breached the implied covenant of good faith and fair dealing by making "clear and unambiguous promises to enter into a written distributorship agreement with KP" although it did not intend to enter into an agreement and was negotiating with KP's competitor, West Pico. (AC at 7.) However, "New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and a breach of contract on the same facts." Bay Fireworks, Inc., 359 F. Supp. 2d at 266. Therefore, this claim must be dismissed. KP's argument that "[its] claims for breach of covenant of good faith and fair dealing are not duplicative of the breach of contract claim" is unsupported and unpersuasive. (Pl. Br. at 9.) Although KP claims that Blue & White wrongfully negotiated with KP's competitor West Pico, KP's claim of breach of the covenant of good faith and fair dealing rests on Blue & White's

8

purported failure to honor the Agreement. See Ari and Co., Inc., 273 F. Supp. 2d at 522. This assertion is almost identical to KP's breach of contract claims. Moreover, the damages sought under the breach of the implied covenant claim are identical to those asserted in the breach of contract claims, thereby requiring dismissal. See id. at 523 (dismissing the plaintiff's breach of the implied covenant of good faith claim because the damages requested for the claims were intrinsically tied to and repeated those requested for the breach of contract claims). Here, KP seeks to recover compensatory damages "in excess of $5 million," the same amount requested in both breach of contract claims. (AC at 8.) Thus, KP's claim of breach of the implied covenant of good faith is dismissed as duplicative of the breach of contract claim.

### B. Breach of Contract Claim

#### 1. Blue & White Did Not Manifest Intent to be Bound

KP, a third party beneficiary to the Agreement between Blue & White and Norman, asserts that Blue & White breached the Agreement by failing to enter into a distributorship agreement, whether exclusive or otherwise, with KP. Blue & White in turn argues that it had no obligation to conclude such an agreement with KP and that the Agreement in question fails for indefiniteness.

KP's breach of contract claim must be dismissed because the Agreement and subsequent correspondence did not obligate Blue & White to grant KP a distributorship agreement. To establish a breach of contract, the plaintiff must first show that a legally enforceable agreement existed. See Wachovia Bank, Nat'l Ass'n v. Mortgage Lenders Network USA, Inc., No. 03 Civ. 8809, 2005 WL 578942, at *4 (S.D.N.Y. March 10, 2005).

Section 4(b) of the Agreement, upon which KP relies in asserting that Black & White is

contractually bound, obligated Blue & White to use "*commercially reasonable efforts* to promptly conclude a distribution agreement with [KP], for the distribution of [Blue & White]'s products within those portions of California in which [KP] now distributes [Blue & White]'s products, *on terms mutually acceptable* to [Blue & White] and [KP]" (emphasis added). In no way does this language suggest that Blue & White was *required* to offer KP a distribution agreement, whether exclusive or not. Rather than constituting a binding contract, the language in § 4(b) reflects only an agreement to agree, binding the parties to conduct good faith negotiations toward that goal. The requirement that Blue & White use "commercially reasonable efforts to . . . conclude" an agreement makes clear that no binding distribution agreement had previously been or was then created by the 2002 Agreement. Rather, the parties were clearly still in the process of negotiating. The requirement that the agreement be "mutually acceptable" also provides an unmistakable indication that Blue & White did not intend to be bound until both parties had assented to some future agreement.

The subsequent correspondence between the parties further supports Blue & White's contention that the Agreement was merely a non-binding agreement to agree. In his July 14, 2003 fax to KP, Blue & White's CEO stated, "I disagree strongly with your statement that [Blue & White] has no intention of giving [KP] an agreement and that we wish to take business away from [KP]. Yes, I agree that we have disagreement on some issues, but I am confident that we can overcome them . . . I suggest that you come to visit us in New York. I am sure we can come to an agreement that we will both be happy with." (Pl. Ex. G.) Blue & White's statement that it was "sure that [they] could come to an agreement that [they would] both be happy with" reinforces Blue & White's assertion that no such agreement had yet been created and mutually

10

assented to. Typically, "where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract." Wachovia, 2005 WL 578942, at *5 (internal citation and quotation marks omitted). Blue & White's invitation to New York further reflects Blue & White's willingness to negotiate a future agreement but does not suggest that Blue & White already believed itself bound by § 4(b) of the Agreement to use KP as its West Coast distributor.

KP's argument that Blue & White should be required to continue an exclusive relationship with KP because KP was the exclusive distributor of Blue & White's products at the time the Agreement was executed also is unavailing. Although KP argues that the contract must be interpreted in light of the parties' on-going relationship, the simple fact of the parties' prior relationship cannot be construed as creating a contractual obligation to maintain that relationship going forward. See Wachovia, 2005 WL 578942, at *5 (noting that several courts have adopted Tribune's classification of Type II agreements, in which parties do not bind themselves to conclude a deal but only to negotiate in good faith towards an agreement, in the context of on-going relationships) (internal citation omitted).

### 2. The Purported Agreement Is Indefinite and Therefore Is Unenforceable

Even if the parties did agree to be bound by the Agreement, the purported "contract" is unenforceable as a matter of law under the doctrine of indefiniteness. "[I]f the material terms are not reasonably certain, there is no enforceable contract." Gianascio v. Giordano, No. 99 CV 1796, 2003 WL 22999454, at *3 (S.D.N.Y. Dec. 19, 2003) (internal citations omitted). In the instant case, § 4(b) of the Agreement is silent as to indispensable terms such as payment, scope of distribution, and duration of the alleged distribution agreement. Although the Proposed

11

Agreement sets forth Blue & White's attempt to reach a mutually acceptable distribution agreement, KP rejected the Proposed Agreement as commercially unreasonable, and thus, the terms remain open and unresolved.

KP suggests that the missing terms may be determined by looking to the parties' ongoing relationship and to what is commercially reasonable. However, in the instant case, the contract is not "sufficiently certain and specific so that what was promised can be ascertained." Joseph Martin, Jr. Delicatessen, 417 N.E.2d at 249. Therefore, the court, in intervening, "would be imposing its own conception of what the parties should or might have undertaken, rather than confining itself to the implementation of a bargain to which they have mutually committed themselves." Id. at 249. KP's breach of contract claims and claims for specific performance are therefore dismissed.

  **C. KP Failed to Demonstrate the Elements of Promissory Estoppel**

KP also seeks damages on a promissory estoppel theory. KP argues that Blue & White made a "clear and unambiguous written promise to enter into a distribution with KP" which was reiterated numerous times. (AC at 6.) KP alleges that, acting in reliance upon such representations, KP continued to sell Blue & White's products and did not seek alternative suppliers. (Id.) As a result of Blue & White's agreement with KP's competitor, West Pico, KP claims it has lost many of its customers. (AC at 4.) KP maintains that as a direct and proximate cause of Blue & White's conduct, KP has sustained damages of over $5 million. (AC at 6-7.) However, Blue & White maintains that as KP itself characterizes the purported promise as ambiguous, the claims for promissory estoppel should be dismissed. (Def. Reply at 6.)

Promissory estoppel is inapplicable in the instant case. Although a plaintiff may recover

damages under promissory estoppel where there is no enforceable contract, here, KP has not shown that it received a clear and unambiguous promise from Blue & White, and thus has not satisfied the first element of the promissory estoppel test. See Cyberchron, 831 F. Supp. at 112; see also Reprosystem, B.V. v. SCM Corp., 727 F.2d at 264 (holding that under New York law, promissory estoppel has three elements: 1) a clear and unambiguous promise; 2) a reasonable and foreseeable reliance by the party to whom the promise is made; and 3) an injury sustained by the party asserting the estoppel as a result of his reliance). The Agreement merely required Blue & White to use "commercially reasonable efforts" to promptly conclude an agreement on "mutually acceptable" terms. (Defendant's Ex. B at 4.) As discussed above, Blue & White's July 16, 2003 correspondence expressing confidence that the two parties could overcome disagreements likewise does not amount to a clear and unambiguous promise. (Plaintiff's Ex. G.) Even viewing the facts in a light most favorable to KP, a reasonable trier of fact would be constrained to find that neither § 4(b) of the Agreement nor the correspondence made by Blue & White's CEO represents a clear promise to grant KP a distribution agreement. Rather, they indicate Blue & White's willingness to use "commercially reasonable" efforts to negotiate a "mutually acceptable" agreement with KP, or, in other words to make a honest effort to reach an agreement. The parties' failure to conclude such an agreement, and Blue & White's subsequent success in establishing a business relationship with another entity does not convert the breakdown of a longstanding business relationship into a viable promissory estoppel claim.

## IV. CONCLUSION

For the reasons set forth above, Blue & White's motion to dismiss is GRANTED. The Clerk of Court is directed to close the case.

SO ORDERED.

Dated: August 9, 2005                              /s/ Nicholas G. Garaufis
      Brooklyn, N.Y.                            Nicholas G. Garaufis
                                             United States District Judge